JANE PANKIEWICZ, PETITIONER-RESPONDENT, v. NEW JERSEY BELL TELEPHONE CO., RESPONDENT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued October 8, 1968—Decided November 14, 1968.

Gaulkin, S. J. A. D. dissented.

Before Judges GAULKIN, COLLESTER and LABRECQUE.

*Mr. Andrew Lawrie* argued the cause for appellant (*Messrs. Lawrie and Jennings,* attorneys).

*Mr. Robert A. Shaw* argued the cause for respondent (*Messrs. O'Brien, Devlin & Shaw,* attorneys).

PER CURIAM. In this proceeding for workmen's compensation death benefits, which resulted from the death of petitioner's husband by heart attack, both the judge of compensation and the County Court judge in a *de novo* review, found that decedent's death was causally related to his work effort. We conclude that the findings of the County Court could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole. *Close v. Kordulak Bros.*, 44 *N. J.* 589, 599 (1965).

Affirmed.

GAULKIN, S. J. A. D. (dissenting) : In *Schiffres v. Kittatinny Lodge, Inc.*, 39 *N. J.* 139, 152 (1963) the Supreme Court said:

"Let us suggest the problem which concerns a court composed of laymen, not physicians. Facts must be found in the record (as distinguished from mere conclusory statements) which will demonstrate to the inquiring and reasoning judicial mind that the relation of cause and effect existed * * *. And that conclusion can be accepted only if the facts proved and inferences from them are sufficiently credible and convincing as to outweigh incompatible facts or inferences."

This standard has not been changed by *Close v. Kordulak Bros.*, 44 *N. J.* 589 (1965). The only effect of *Close v. Kordulak Bros.* is that the Appellate Division no longer makes these findings itself but determines whether the findings made by the County Court " 'could reasonably have been reached on sufficient credible evidence present in the record' considering 'the proofs as a whole' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility * * *." *Close, p.* 599. In my opinion, here the findings of the County Court are not based on facts but upon mere conclusory statements which cannot support an award.

The opportunity of the Judge of Compensation to hear the witnesses is of no importance in the case at bar. The

testimony of the lay witnesses was substantially undisputed and the veracity of the medical witnesses is not challenged. The case resolved itself into a battle of experts — Dr. Rowland D. Goodman for petitioner and Dr. Jerome Kaufman for respondent, neither of whom had known decedent during his lifetime.

It seems to me that Dr. Goodman's opinion that decedent's work contributed to his death was a mere conclusion, not supported by the "facts proved and inferences from them * * *." The sum of his testimony appears to me to be that (1) decedent died during working hours of a coronary occlusion (2) the work he had been doing that morning could not have caused his death that day unless he had had an underlying *serious* coronary artery disease — what he called "an impending myocardial infarction"; therefore (3) he must have had the impending myocardial infarction; (4) since he had the "impending myocardial infarction," the work he did that morning was sufficient to cause his death that day. It seems to me that such circular reasoning should not be accepted as the basis for an award. If it must be, I cannot see how an award can be denied to any manual worker who dies during working hours.

There was no autopsy. Defendant was never treated for a heart condition nor told he had one. He appeared to be in good health until December 26, 1963, two months before he died. On December 26, 1963, while attending a funeral, he was sick to his stomach, pale and drawn. Petitioner's own brief describes his health thereafter as follows: "During the month of January of 1964, the decedent's widow, or other members of his family did not notice anything significant one way or the other regarding decedent's health. On February 7, 1964, the decedent's widow noticed further changes in the decedent's health. On this date, he appeared pale, and had a drawn look. Decedent did not go to work, but stayed home in bed on that date. His stomach was upset, and he was taking pills that he received from Bell Telephone Company, which pills were labeled 'Digestive

Compound Tablets for relief of stomach upset, heartburn or mild diarrhea'. Subsequent to February 7, 1964, the decedent returned to work. On or about February 18, 1964, he came home from work about 9:30 A. M. The decedent's widow, on that day, noticed that he was 'breathing funny'. He did not feel good. He looked as if he needed a shave, but upon closer examination by decedent's widow, he just appeared gray, and did not need a shave. On this day, the decedent attempted to take a ride in the car, and went to a shopping center, but because of how he felt, did not go in, but returned home. The decedent's son, Daniel Pankiewicz, testified that during the month of February, decedent appeared tired all of the time and that this increased in frequence. On the date of his death, the decedent was first noticed by his son, Joseph Pankiewicz, at about 7:00 or 7:30 in the morning. The decedent appeared pale."

Dr. Goodman testified that he concluded from the foregoing that decedent had "impending myocardial infarction" because of the above described "symptoms of sickness to the stomach, appearing gray, shortness of breath * * *." But on cross-examination he testified:

"Q Those facts [as to his December 26 symptoms] in and of themselves are not sufficient for you to determine any diagnosis, are they?
A That is correct.
Q Those symptoms doctor are symptoms of many ailments, aren't they?
A Yes, they are.
Q For instance, this man could have had what is commonly known as a stomach virus, isn't that so?
A Yes, he could have.
Q He could have what is commonly known as a cold, couldn't he?
A Yes.
Q The same is true of the symptoms that were given to you as his condition of December 27, 1963, isn't that true?
A Yes.
Q The same is true of the symptoms that you were advised he had on February 7th, 1964?
A No, sir.
Q What is there about those symptoms of February 7, 1964, that make you say they're different?

A I was told on February 7, 1964, that he for the first time manifested shortness of breath and that is a symptom that is particularly cardiac in origin and not associated with the simple upset stomach, common cold and et cetera.

Q They could also be symptoms of respiratory or pulmonary disorders, could it not?

A Yes. In those occasions it would be accompanied by wheezing or something that would suggest a respiratory infection.

Q You weren't told anything other than those symptoms given to you in hypothetical question; is that so?

A That is correct.

Q You cannot make a diagnosis of what this man had on February 7th, merely on those symptoms; is that right?

A I don't believe I made a diagnosis. The cause [course?] of illness made me believe that this first began and manifested itself as coronary artery disease as early as December 26, 1963. Certainly sometime in February 1964—*this of course is a medical theory based most probably on the course of events in this case.*

Q However, you will agree, will you not, that not having seen the man at those times, it's speculation on your part as to whether that is evidence of coronary disease?

❊ ❊ ❊ ❊ ❊ ❊ ❊ ❊

A What the term speculation means to me is, guessing, I don't feel that I am guessing. *The description of the course of events that occurred to this individual I believe was given in the most probable medical course.*

Q If these facts were furnished you in all and I was to ask your opinion of what the man's disease was at that time, you would refuse to give an answer; would you not?

A *With or without the subsequent coronary?*

Q If you were asked on February 7th what this man had, you would refuse to give an answer?

❊ ❊ ❊ ❊ ❊ ❊ ❊ ❊

A *Of course, based on the symptoms of the person's grayness and the shortness of breath on exertion, I could not come up with a diagnosis."* (Emphasis added)

On direct examination, Dr. Goodman had given a description of the mechanics by which, in his opinion, decedent's work effort "aggravated and accelerated" his condition and brought about his death. He said:

"There is no doubt in my mind that the work effort or strain described to me was of sufficient degree to produce the physiologic event namely, the increased pulse, increased pressure and heart rate to produce the physiological process described. When these events occur in the individual, there are certain symptoms, such as severe

chest pain, shortness of breath, feelings of general illness, which we call malaise, fallen blood pressure or shock and congestive failure."

However, on cross-examination he admitted that the hypothetical question on which he based his opinion contained no reference to any manifestation of such symptoms on the day decedent died. As a matter of fact, there was no evidence that decedent did exhibit any such symptoms. On the contrary, the co-worker who was with him at all times observed nothing wrong with decedent before the moment of his collapse, and decedent made no complaint. Furthermore, about a half hour after he finished the work which allegedly brought on the coronary occlusion, and while (according to Dr. Goodman) he was in the throes of the attack brought on by that work, decedent *jogged* to his truck to get his lunch and *jogged back* to join his co-worker! If the work had the effect which Dr. Goodman said decedent must have felt but concealed — "severe chest pain, shortness of breath, feelings of general illness * * *" — it is inconceivable to me that decedent would have *jogged* to his truck, gotten his lunch, and *jogged* back. (He died shortly thereafter.) One would expect him to have walked slowly or, indeed, to have passed up his lunch altogether.

The work that decedent did the morning he died was not unusual for him, nor so heavy that it would have injured a worker of even modest health and strength — in short, the average man. As I said, if Dr. Goodman's circular reasoning be accepted, the death of every manual worker who dies during working hours for no apparent reason will have to be compensated. I have no objection to having the deaths of all employees, however caused, compensated, but that is a matter for direct action by the Legislature. So long as that is not yet the law, *Murch v. Larkey Co.*, 48 *N. J.* 388 (1967), we should enforce the law as it is.

The telephone company says that it has about 25,000 manual workers; that, since many people die of heart attacks even while at rest, by the law of averages many

of its workers will die at work; and it asks whether all of these deaths must hereafter be paid for by it. The company points out that, although the courts have held some such deaths not compensable, the cases have provided no useable formula by which an employer can determine which deaths it should pay for without litigation. The company asks us to compose a more workable rule than now exists, one by which it will be able at least to determine which heart deaths are probably not compensable. If there were such a rule, says the company, it would pay the others without the endless and unsatisfactory litigation to which it must now resort.

It is probably true that no such rule exists at present, but if one is to be formulated to govern future cases I think the Supreme Court must do it. However, here I think we should say that circular reasoning such as Dr. Goodman's does not prove compensability.

I would reverse.